IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Kevin Morder                          :

    Plaintiff                         :

    v.                                : Case No. 3:16-CV-213

Carolyn W. Colvin                     : Judge Richard P. Conaboy
Acting Commissioner of
Social Security                       :

_____

**MEMORANDUM**

## I.   Procedural Background.

We consider here Plaintiff's appeal from a decision of the Social Security Administration ("SSA" or "Agency") denying his application for Disability Insurance Benefits ("DIB").  Plaintiff initially alleged a period of disability beginning June 30, 2011. (R.12).  After appearing and testifying at a hearing before an administrative law judge ("ALJ") on June 18, 2014, Plaintiff amended his alleged onset date to October 21, 2011.  (Id.).  The ALJ issued an unfavorable decision on July 9, 2014 (R.9-24) whereupon Plaintiff filed a Request for Review with the Appeals Council.  (R.7-8).  The Appeals Council denied Plaintiff's request for review (R.6) and said denial constitutes a Final Decision of the SSA.  Accordingly, this matter is properly before this Court pursuant to 42 U.S.C. § 405(g).  The parties have briefed (Docs. 12-17 and 19) their respective positions and this matter is now ripe for disposition.

1

**II.  Testimony Before the ALJ**.

A hearing was conducted by ALJ Reana K. Sweeney on June 18, 2014.  Plaintiff was represented at the hearing by Attorney Steven M. Serra.  The Plaintiff testified and additional testimony was taken from Michael Kibler, a vocational expert.

Plaintiff's testimony may be summarized as follows.  He was born on August 10, 1972 and was 41 years of age at the time of the hearing.  He resides with his girlfriend and her daughter.  He applied for unemployment compensation on June 20, 2011 and received unemployment compensation benefits until they were exhausted at the end of September, 2013.  During this time he held himself out as available to work.  He stated, by way of clarification, that he considered himself capable of performing only part-time driving jobs during that time frame.  He also indicated that he applied for 10-20 jobs of this type while receiving unemployment compensation. (R.31-34).

Plaintiff also testified that he filed a workmen's compensation case in which he alleged that he suffered a work-related injury on March 10, 2011.  He explained that his original onset date in his Social Security application was June 30, 2011, the date that his employer no longer had part-time light duty work available for him.  Plaintiff indicated further that he tried to perform light duty office work but he could not sustain it because he was unable to sit in a chair as the position required.  His

2

workmen's compensation case settled on March 7, 2012, and he stated that he settled the case on the advice of his attorney.  He could not recall whether he had filed workmen's compensation cases before the claim he settled in March of 2012.  The claim he settled was characterized as a low back strain.  (R.35-37).

Plaintiff stated that he was 5' 7" tall and weighed about 195 pounds.  He is right-hand dominant.  He holds a valid driver's license and has completed the twelfth grade.  He is fluent in English and can do simple arithmetic.  He has neither served in the military nor been incarcerated in the last 15 years.  His work history includes employment at Sam's Club, Costco, C & S Wholesale, and Central Pennsylvania Food Bank.  He stated that he returned to work one time after October 21, 2011 and that his employer, for whom he drove a van, was Yellow Breeches Educational Center.  The employment with Yellow Breeches began after his unemployment compensation ran out and continued through the end of 2013.  During that time he worked 20 hours per week at $12.00 per hour.  He never asked for full-time work and it was never offered him.  He was still employed with Yellow Breeches at the time of the hearing but was not actively working because Yellow Breeches (a school) was off for the summer.  (R.37-43).

Plaintiff stated that he had his first back surgery, a laminectomy in 2003.  He had a subsequent back surgery, a fusion, later in 2003.  The hardware from the fusion was removed in early

2004.  He has had no additional surgery since 2004.  Plaintiff has not had any inpatient hospitalizations due to his back symptoms since his onset date, October 21, 2011.  He did undergo a course of physical therapy in 2011 before his onset date and an additional course of physical therapy after his onset date.  These courses of physical therapy lasted several months.  Plaintiff has had no additional physical therapy from the end of 2011 through the end of 2013.  He stated that, at one point, he used an H-Wave unit for a short time in 2011.  He had some injections to alleviate his back pain at some point but could not recall if those were administered before or after his onset date.  He uses a low back brace "a couple hours a day" when he is walking or sitting.  He takes it off when he is reclining.  (R.44-47).

Plaintiff stated that Dr. Morganstein had given him a regimen of exercise and stretching to perform.  He did the exercises for a time but stopped because he felt that they weren't working.  He continued to perform the stretching as prescribed.  When Plaintiff applied for jobs after settling his workmen's compensation claim he would indicate that he could not lift more than 10-15 pounds, could not frequently twist, kneel, bend or climb, could walk only short distances, could sit for only short periods, and needed to shift positions frequently.  He testified that he spends 10 minutes twice each day walking on a treadmill.  (R.48-49).

Plaintiff suffered his work-related injury while lifting a ten

4

pound case.  Subsequently, he treated with Dr. Morganstein.  He saw Dr. Morganstein every 3-4 months but saw his physician's assistant more frequently.  He typically spends 10-15 minutes with Dr. Morganstein on those occasions that he sees him personally.  The doctor typically measures his range of movement, revises his medications, and advises him on how to take them correctly.  He denied receiving a full physical examination at any time from the physician's assistant.  (R.50-51).

Plaintiff described his "typical day" as follows.  He arises at 5:30 a.m. and immediately takes a shower.  He then watches television until it is time to transport the kids to school.  He takes no medication before he returns home at approximately 8:00 a.m.  He works a split schedule.  The first shift is from 6:40 a.m. to 8:00 a.m. and the second shift is from 2:30 to 3:30 p.m. Between 8:00 a.m. and 2:30 p.m. he reclines on the couch and watches television.  At 3:30 when he returns from his second shift he prepares dinner and then lays down again.  When his girlfriend and her daughter return home after 5:00 p.m., he is unable to engage in any physical activities with them.  He has taken Oxycodone to relieve his pain every day for 2-3 years.  He takes 4-6 Oxycodone tablets each day.  He takes the medication between shifts, that is between 8:00 a.m and 2:30 p.m each day.  They help to alleviate his pain, but he does not think he could perform a full-time job because he would need to take the Oxycodone at work and feels that

he could not work effectively while under the influence of the medication.  He does not recall telling his physician about any side effects he experiences as a result of taking Oxycodone. (R.52-58).

Upon questioning by his attorney, Plaintiff stated that he experiences drowsiness and dizziness as side effects of his medication.  He said that both the Oxycodone and a muscle relaxant that he uses only at night produce these effects.  He stated further that he had mentioned these side effects to Jamie Walters, Dr. Morganstein's physician's assistant.  Plaintiff indicated further that he could neither sit nor stand for more than 15-20 minutes without experiencing sharp pain in his left lumbar region. Walking just a few city blocks produces the same pain in the same area and requires him to stop and rest for 10 minutes before continuing.  He stated that he could lift or carry no more than 10 pounds without pain.  (R.59-60).

Plaintiff testified about an independent medical examination he underwent at some undefined point in time and stated that the examination lasted only 10-15 minutes.  The physician who performed the independent medical examination released Plaintiff to "light work".  He tried to perform light duty jobs at a computer terminal and as an inventory taker in a warehouse.  Those jobs, which were part-time jobs performed four hours per day, were both too difficult for him.  He stated that while on these part-time light

6

duty jobs he was missing 1-2 days of work each week.  (R.61-62).

Plaintiff also indicated that while he was doing the job of a part-time van driver (in October, November, and December of 2013) he had no medical insurance and was paying for his medications out of his own pocket.  He was paying about $120.00 per month in total for his Oxycodone and his Tizanidine, a muscle relaxant.  During this time, he was paying $75.00 each time he made an office visit to Dr. Morganstein's office as well.  (R.62-63).

Testimony was also taken from Michael Kibler, a vocational expert.  Mr. Kibler stated that he had reviewed the medical exhibits in the case and that he was familiar with both the rulings and regulations regarding vocational considerations and the Dictionary of Occupational Titles.  Mr. Kibler was asked by the ALJ to respond to two hypothetical questions regarding the Plaintiff's residual functional capacity ("RFC").  The first hypothetical question assumed that Plaintiff was confined to a "light exertional base" as defined in the DOT.  The hypothetical question also assumed that Plaintiff: could only occasionally climb ramps and stairs; could never walk on scaffolds or climb ladders; could only occasionally bend to the waist, kneel, crouch, and reach overhead bilaterally; and could never crawl on hands and knees. Additionally, the hypothetical question assumed that Plaintiff must avoid work in extremely cold locations; must avoid working around large vibrating objects or services; must avoid hazardous machines

in high places and fast-moving machinery on the ground; and must avoid working around sharp objects and caustic chemicals.  Mr. Kibler testified that, given the limitations in the first hypothetical question, Plaintiff would still be able to perform such past relevant work as a cashier and a van driver.  (R.64-70).

The ALJ then asked Mr. Kibler a second hypothetical question which included all limitations of the first with the additional limitations that Plaintiff could perform work sitting or standing but that he must be able to change positions every 60 minutes for up to two minutes before resuming another position.  Given the additional limitations imposed by the second hypothetical question, the vocational expert stated that Plaintiff could not perform any of his past relevant work but that he could perform four jobs that he identified.  These position were: electrical accessories assembler I; small products assembler; conveyor line bakery worker; and egg handler.  The vocational expert stated that his opinions were based upon his knowledge of pertinent regulations, the DOT, and his 29 years of experience placing disabled persons.  (R.71-74).

Upon questioning by Plaintiff's attorney that asked the vocational expert to assume additional limitations over and above all those referenced by the ALJ (including a sit/stand option that permitted an individual to walk around every 15 minutes for 5 minutes at a time; a limitation of sitting no more than two hours

and standing/walking no more than four hours in an eight-hour day; and that the individual would be absent from work for more than four days each month as a result of his physical impairments), the vocational expert stated that a person with these additional impairments would be unable to sustain any competitive employment. (R.74-75).

## III. Medical Evidence.

### a.   Dr. Grandrimo.

Dr. John Grandrimo, D.O., an Orthopedic Specialist, saw Plaintiff for the first time on March 25, 2011 on referral from Dr. Tamara Sullivan.  Dr. Grandrimo's office notes of that visit reveal that Plaintiff was sent to him for an orthopedic consult as a result of a work-related injury suffered two weeks earlier.  He recorded that Plaintiff complained of low back and left buttock pain as well as intermittent numbness down to his toes.  Sitting and walking reportedly increased Plaintiff's symptoms.  Focal exam of his lumbar spine showed negative straight leg raise bilaterally, intact sensation, good plantar flexion and dorsiflexion of the feet and low back tenderness to palpation across the lumbar area as well as the left posterior superior iliac spine ("PSIS").  Plaintiff's lumbar spine had decreased flexion.  X-rays of Plaintiff's lumbar spine revealed changes at L5-S1 along with straightening of the normal lordosis of the back as well as a mild retrolisthesis at L5-

S1.[1]  Review of an MRI revealed minimal bulging at L5-S1 with prior surgical scarring.  Dr. Grandrimo's impression was lumbar sprain/strain and he considered the possibility of having Plaintiff start back to work on light duty status.  However, he noted that should Plaintiff continue to experience the same problems, he would consider an epidural PSIS injection.  On April 25, 2011, this step proved necessary.  Dr. Grandrimo's notes of the procedure indicated that Plaintiff had developed left PSIS and had failed conservative treatment.  Dr. Grandrimo stated also that Plaintiff tolerated the procedure well and ten minutes afterward he started to feel relief. (R.398-99, 404-05).

On May 27, 2011, Dr. Grandrimo again saw Plaintiff.  On this occasion, Dr. Grandrimo stated that Plaintiff was feeling better with no complaints of numbness or tingling.  Plaintiff had good range of movement in his lumbar spine and minimal tenderness to palpation on the left side.  Dr. Grandrimo's impression was "status post left PSIS injection with improving sacroiliitis/lumbar strain."  He announced an intention to return Plaintiff to his regular job on sedentary duty for three weeks.  (R.397).

Dr. Grandrimo saw Plaintiff for the last time on June 29, 2011.  At that time, Plaintiff had a lot of back pain and was not progressing well.  His symptoms were exacerbated by twisting,

---

[1] A retrolisthesis is a backward slippage of one vertebra onto the vertebra immediately below. www.medicaldictionary.com/retrolistheseis.

turning and sitting for too long.  The Plaintiff was experiencing lumbar pain upon flexion or extension.  Dr. Grandrimo stated that he believed Plaintiff had some back pain but that he had nothing else to offer him as he was not a surgical candidate.  Dr. Grandrimo also stated that Plaintiff could do "some work" and recommended that he be placed on a light-duty job four hours per day.  He then referred Plaintiff to Dr. Morganstein for continued care.  (R.394-396, 536-37).

### b.   Dr. Morganstein.

Dr. Steven Morganstein, D.O., was Plaintiff's treating physician after referral from Dr. Grandrimo from July 26, 2011 through the time of the hearing in this case.  Dr. Morganstein saw Plaintiff on no fewer than 11 occasions in this period of approximately three years.

On July 26, 2011, Dr. Morganstein saw Plaintiff for the first time.  In a letter to Dr. Grandrimo after his first session with Plaintiff, Dr. Morganstein's impression was low back pain and sacroiliitus.  He prescribed Zanoflex for muscle spasms and Percocet for pain.  He noted 5/5 motor strength in Plaintiff's lower extremities and that Plaintiff walked with a normal gait. Straight leg-raising tests were negative both sitting and supine. At this point, Dr. Morganstein thought Plaintiff could do sedentary work with no lifting over ten pounds and no bending, twisting or squatting.  (R.692-04).

On August 23, 2011, Plaintiff came to Dr. Morganstein's office for an unscheduled visit after completing a physical therapy session. Plaintiff was complaining at this time of increased low back pain. Physical examination revealed tenderness to palpation at L3 to L5 and decreased forward flexion due to pain. Again, his straight leg-raising tests were negative, he had full range of motion of his lower extremities, and his gait was normal. Dr. Morganstein's impressions were unaltered and he prescribed a prednisone taper in addition to the previously prescribed medications to try to alleviate Plaintiff's increased symptoms. Dr. Morganstein noted that if Plaintiff's condition did not improve he would consider administering a lumbar epidural steroidal injection. He directed Plaintiff to remain off work. (R.600-01).

On September 6, 2011, Dr. Morganstein again examined Plaintiff. Plaintiff complained of pain in his low back and numbness/tingling in his buttocks and left leg. Straight leg-raising tests remained negative. Plaintiff's range of motion was moderately limited due to pain and Dr. Morganstein assessed Plaintiff's pain at level 9. Dr. Morganstein noted that bilateral leg strength was 5/5. Plaintiff walked with a slow gait. Dr. Morganstein stated that he would schedule Plaintiff for an epidural injection to the left sacroiliac joint. He assessed Plaintiff as suffering from "neuritis or radiculitis thoracic or lumbosacral". (R.587-99).

Dr. Morganstein next saw Plaintiff on October 10, 2011.  At
that session Plaintiff reported that the epidural injection he had
received about one month earlier had provided very minimal
improvement for only one week.  Upon examination, Dr. Morganstein
assessed Plaintiff's pain level at 7-8.  Plaintiff walked with a
slow gait, continued to demonstrate limited forward flexion due to
pain, and experienced increased pain with rotation of his spine.
He continued to exhibit normal leg strength bilaterally and
exhibited no atrophy of the lower extremities.  Dr. Morganstein's
assessment remained "neuritis or radiculitis thoracic or
lumbosacral".  (R.595-96).  On November 29, 2011, January 31, 2012,
March 6, 2012, June 21, 2012, and October 23, 2012, Dr.
Morganstein's assessments remained unchanged.  Plaintiff's pain
level was assessed at Level 7 or Level 8 on each occasion. On
examination dated March 6, 2012, Dr. Morganstein did note an
increased range of forward flexion to 90 degrees.  He continued to
prescribe Percocet for pain and Zanoflex for spasm control.
(R.584-94).

Plaintiff again saw Dr. Morganstein on February 26, 2013 and
indicated at that time that his low back pain had gotten worse over
the previous month.  He complained of a burning pain across his
lower back that was aggravated by prolonged sitting.  He told Dr.
Morganstein that he was frustrated because he had been trying to
find a job unsuccessfully for the past year due to his back

problems.  Dr. Morganstein assessed Plaintiff's pain at Level 9 but
once again noted that Plaintiff walked with a normal gait and
displayed no loss of strength or atrophy of the lower extremities
bilaterally.  Dr. Morganstein added a prednisone taper to
Plaintiff's regimen of medication in an attempt to address
Plaintiff's increased back pain.  (R.581-83).  Plaintiff again saw
Dr. Morganstein on May 26, 2013 and September 30, 2013.  On each
occasion he reported that his back pain had improved and felt that
he was somewhat better.  He continued to report that his pain was
aggravated by prolonged sitting and continued to express
frustration that he had not been able to find work due to his back
problems.  On examination on both dates, he walked with a normal
gait, exhibited negative leg-raising tests bilaterally, and
displayed no atrophy or loss of strength in his legs.  Dr.
Morganstein's assessment remained constant on both occasions and he
continued Plaintiff on the same medications he had been taking for
almost two years.  (R.625-30).

    The last treatment note in the record by Dr. Morganstein is
dated January 31, 2014.  On that occasion Plaintiff reported that
his low back pain had remained stable and Dr. Morganstein assessed
his pain at Level 7.  Plaintiff, once again, walked with a normal
gait and had somewhat limited forward flexion.  As on each previous
visit, Plaintiff's leg-raising tests were negative bilaterally, his
lower extremity motor strength was 5/5, and there was no atrophy of

the lower limbs.  Dr. Morganstein's assessment remained constant as "neuritis or radiculitis thoracic or lumbosacral" and he added an additional assessment of "disc disorder other and unspecified lumbar region".  Plaintiff was directed to remain on the same regimen he had been following for many months with respect to his medications and daily stretching.  (R.631-33).

On May 20, 2014, Dr. Morganstein completed a Physical Residual Functional Capacity Questionnaire with respect to Plaintiff.  He indicated that Plaintiff had constant low back pain that varied from 6/10 to 9/10.  Dr. Morganstein also indicated that Oxycodone was effective in relieving Plaintiff's pain but left him light headed.  He stated that Plaintiff is not a malingerer and that he could tolerate a high degree of mental stress but had limited tolerance for physical stress.  He stated that Plaintiff: could walk no more than two blocks without rest or severe pain; could sit for no more than 10-15 minutes before changing positions in a hardback chair and no more than one hour at a time in a supportive chair partially reclined; could not stand for more than 30 minutes at a time; could not sit/stand/walk more than four hours in an eight-hour workday; required a job that permitted him to sit, stand, or walk at will; could lift ten pounds or less frequently, up to 20 pounds occasionally and never lift more than 20 pounds; could rarely twist, stoop, crouch, and climb stairs and never climb ladders; and had impairments that would produce both good and bad

days and could be expected to miss work more than four days per month.  Dr. Morganstein also indicated that the previously stated limitations had existed since July 26, 2011.

### c.   Dr. Fras.

On July 8, 2011, Dr. Christian Fras, M.D., evaluated Plaintiff at the request of Plaintiff's employer in the context of his workmen's compensation case.  Mr. Morder appeared for the IME wearing a back brace but took it off to allow physical examination. He walked with a normal gait and stood with a normal station.  He exhibited no tenderness to palpation anywhere in his back.  He had no paraspinal muscle spasm and had full range of motion in his lower back.  He did exhibit tenderness over the left sacroiliac joint.  Dr. Fras noted 5/5 strength in Plaintiff's legs and ankles and that Plaintiff's sensation to light touch was intact.  Various clinical signs were negative but Plaintiff did have pain during range of motion activities of his hips, particularly on the left side.  The range of motion activities also produced left buttock pain.  Dr. Fras diagnosed Plaintiff as suffering from a left sacroiliac joint sprain/irritation which he characterized as ongoing.  He opined that chiropractic therapy, osteopathic manipulation, and pain management with injections could produce maximal medical improvement in six months time.  He thought Plaintiff's prognosis to be good despite the fact that he noted Plaintiff was predisposed to the type of injury he had suffered due

16

to prior surgeries.  He assessed that Plaintiff was capable of returning to work "in the light duty range".  (R.618-20).

**IV.   The ALJ Decision.**

The ALJ's decision (Doc. 10-2 at 12-24) was unfavorable to the Plaintiff.  It included the following Findings of Fact and Conclusions of Law:

1.   The claimant last met the insured status requirements of the Social Security Act on December 31, 2013.

2.   The claimant did not engage in substantial gainful activity during the period from his amended alleged onset date of October 21, 2011 through June 30, 2013.  However, the claimant did engage in substantial gainful activity from July 1, 2013 through his date last insured of December 31, 2013 as detailed in Paragraph 12 below.

3.   From October 21, 2011 through June 30, 2013, the claimant had the following severe impairment: degenerative disc disease of the lumbar spine.

4.   From October 21, 2011 through June 30, 2013 the claimant did not have an impairment or combination of impairments that met or

17

medically equaled the severity of one of the
listed impairments in 20 CFR Part 404, Subpart
P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and
404.1526).

5.  After careful consideration of the entire
record the undersigned finds that, from October
21, 2011 through June 30, 2013, the Plaintiff
had the residual functional capacity to perform
light work as defined in 20 CFR 404.1567(b)
except he must have been able to change
position every 60 minutes for up to two minutes
before resuming another position.  The claimant
should never have climbed ropes, ladders,
scaffolding or poles.  He was limited to normal
breaks (a 10-15 minute break, a 10-15 minute
break, a 20-30 minute break, and one or two 5-
10 minute unscheduled breaks).  The claimant
was limited to occasional climbing of ramps and
stairs, stooping, kneeling, crouching and
squatting.  He was precluded from crawling.
The claimant was limited to occasional overhead
reaching with his bilateral upper extremities.
He must have avoided concentrated exposure to
extreme cold.  The claimant's extremities

18

should never have been exposed to large
vibrating objects or surfaces.  The claimant
should have avoided work around or with
hazardous machinery, sharp objects and toxic or
caustic chemicals.  He should have avoided work
at high exposed places.  Furthermore, the
claimant should have avoided work around large
fast-moving machinery on ground.

6.   From October 21, 2011 through June 30, 2013,
the claimant was unable to perform any past
relevant work.

7.   The claimant was born on August 10, 1972 and
was 41 years old, which is defined as a younger
individual age 18-49 on the date last insured.

8.   The claimant has at least a high school
education and is able to communicate in
English.

9.   Transferability of job skills is not material
to the determination of disability because
using the Medical Vocational Rules as a
framework supports a finding that the claimant
is "not disabled," whether or not the claimant
has transferable job skills.

10.  From October 21, 2011 through June 30, 2013,

19

considering the claimant's age, education, work
experience, and residual functional capacity,
there were jobs that existed in significant
numbers in the national economy that the
claimant could have performed.

11.  The claimant was not under a disability, as
defined in the Social Security Act, at any time
from October 21, 2011, the amended alleged
onset date, through June 30, 2013.  The
remainder of this decision will address the
period from July 1, 2013 through December 31,
2013 the date last insured.

12.  From July 1, 2013 through December 31, 2013,
the claimant engaged in substantial gainful
activity.

## V.   Disability Determination Process.

The Commissioner is required to use a five-step analysis to
determine whether a claimant is disabled.[2]  It is necessary for the

---

[2] "Disability" is defined as the "inability to engage in any substantial gainful activity by
reason of any medically determinable physical or mental impairment which can be expected to result
in death or which has lasted or can be expected to last for a continuous period of not less that 12
months . . . ." 42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but cannot,
> considering his age, education, and work experience, engage in any
> other kind of substantial gainful work which exists in the national
> economy, regardless of whether such work exists in the immediate area

Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 CFR §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (R.16-17).

---

in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

## VI. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence–-particularly certain types of evidence (e.g., that offered by treating physicians)--or if

> it really constitutes not evidence but mere
> conclusion.  *See Cotter*, 642 F.2d at 706
> ("Substantial evidence" can only be
> considered as supporting evidence in
> relationship to all the other evidence in the
> record.") (footnote omitted).  The search for
> substantial evidence is thus a qualitative
> exercise without which our review of social
> security disability cases ceases to be merely
> deferential and becomes instead a sham.

710 F.2d at 114.

   This guidance makes clear it is necessary for the Secretary to
analyze all evidence.  If she has not done so and has not
sufficiently explained the weight given to all probative exhibits,
"to say that [the] decision is supported by substantial evidence
approaches an abdication of the court's duty to scrutinize the
record as a whole to determine whether the conclusions reached are
rational."  *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir.
1979).  In *Cotter*, the Circuit Court clarified that the ALJ must
not only state the evidence considered which supports the result
but also indicate what evidence was rejected: "Since it is apparent
that the ALJ cannot reject evidence for no reason or the wrong
reason, an explanation from the ALJ of the reason why probative

evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record."  *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated."  *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions.  *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented."  *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where the ALJ's decision

is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless.  *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.").  An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## VII. Discussion.

## A. General Considerations

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits.  *See Dobrowolsky*, 606 F.2d at 406.  Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim.  *Id.*  "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act."  *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974).  As such,

25

the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

**VIII.    Plaintiff's Allegations of Error.**

*Plaintiff alleges that the ALJ made four errors that individually or collectively require remand of this case. We shall consider these allegations of error in turn.*

**1.    Whether Substantial Evidence Supports the ALJ's RFC Assessment?**

Plaintiff argues that the ALJ's assessment of his RFC is unsupported by the requisite substantial evidence. In support of this argument he claims that various aspects of the RFC assessment are inconsistent with the ALJ's finding that he can do "light work" as defined in 20 CFR 404.1567(b) with further limitations as referenced at pages 18-19 ante. Specifically, Plaintiff correctly contends that "light work" generally involves "a good deal of walking or standing" as the SSA itself acknowledges in SSR 83-10. Plaintiff then asserts that his physician's treatment notes and RFC assessment as stated on a Physical Residual Functional Capacity Questionnaire invalidate the ALJ's RFC assessment because it does

26

not adequately account for Plaintiff's inability to stand/walk to the extent required to perform "light work".

Plaintiff misunderstands what the ALJ has concluded in this regard.  The ALJ did not misunderstand the restrictions generally imposed by "light work".  Rather, the ALJ concluded that the record does not support the physical limitations that Dr. Morganstein, the treating physician, ascribes to his patient.  We will address the propriety of the ALJ's assessment of Plaintiff's physical restrictions in the next section of this memorandum.

With respect to another argument Plaintiff raises, that the ALJ's RFC assessment failed to account for mental impairments caused by side effects of his medications, this Court must agree. The record exhaustively documents the fact that Plaintiff has taken and continues to take opioid pain medications and muscle relaxants on a daily basis.  Claimant testified to the fact that these medications cause him to feel drowsy and lightheaded.  (R.56). Moreover, his physician has documented these side effects. (R.634).  The ALJ cites no contrary medical evidence to excuse the failure to address obvious problems with concentration, persistence, and pace that would naturally flow from these side effects.  It is axiomatic that an RFC assessment must include all of a plaintiff's documented impairments.  Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d. Cir. 1987).  Accordingly, this case must be remanded for a reconsideration of whether Plaintiff's medications

27

caused side effects that further erode the base of "light work" occupations that he could perform or eliminates such work altogether.

## 2. Whether the ALJ Gave Proper Weight to the Medical Opinion of Plaintiff's Treating Physician?

Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight. See, e.g., Fargnoli v. Halter, 247 F.3d 34, 43 (3d. Cir. 2001)(citing 20 CFR § 404.1527(c)(2); Cotter v. Harris, 642 F.2d 700, 704 (3d. Cir. 1981). Oftentimes referred to as the "treating physician rule", this principle is codified at 20 CFR 404.1527(c)(2), and is widely accepted in the Third Circuit. Mason v. Shalala, 994 F.2d 1058(3d. Cir. 1993); See also Dorf v. Brown, 794 F.2d 896 (3d. Cir. 1986). The regulations also address the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight." 20 CFR § 404.1527(c)(2). "A cardinal principle guiding disability, eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of

the patient's condition over a prolonged period of time."  Morales
v. Apfel, 225 F.3d 310, 317 (3d. Cir. 2000)(citations omitted); See
also Brownawell v. Commissioner of Social Security, 5554 F.3d 352,
355 (3d. Cir. 2008).  In choosing to reject the treating
physician's assessment, an ALJ may not make "speculative inferences
from medical reports and may reject a treating physician's opinion
outright only on the basis of contradictory medical evidence and
not due to his or her own credibility judgments, speculation, or
lay opinion."  Morales v. Apfel, supra at 317.

     While the ALJ did not reject outright the treating physician's
opinion in this case, she gave it "little weight" and chose to
subordinate it to opinions provided by a former treating physician,
Dr. Grandrimo, and a onetime consulting physician, Dr. Fras.  The
ALJ's basis for judging the relative reliability of the medical
opinion evidence in this case does not withstand even minimal
scrutiny.

     In assigning great weight to the opinion of Dr. Grandrimo, as
expressed in documents generated on June 29, 2011 (R.394-95; 535-
37) that indicate Plaintiff can perform "light work", the ALJ fails
to note two critical points.  First, the report was generated some
four months before Plaintiff's alleged onset date of disability.
Thus, the report provides, at best, an assessment of Plaintiff's
physical capacities during a time for which he does not seek
benefits.  Second, Dr. Grandrimo specifically noted on the

documents relied upon by the ALJ that he was releasing Plaintiff to "light work" on a part-time, four hours per day basis.  Clearly, this report cannot reasonably be given primacy over the opinion of a longtime treating physician (Dr. Morganstein) because it does not provide evidence that Plaintiff could work in any capacity on a full-time basis as required by the pertinent regulations.

Dr. Fras' opinion dated July 8, 2011 suffers from the same temporal infirmity as Dr. Grandrimo's report.  It merely provides a snapshot of Plaintiff's physical condition some three and one half months before Plaintiff's alleged onset date.  As such, it is not probative of Plaintiff's physical condition during the time frame for which he seeks DIB.  Thus, the Court finds that the reports generated by Drs. Grandrimo and Fras do not, even taken collectively, provide a proper basis for the ALJ to give them greater weight than the report of a treating physician who cared for Plaintiff over a protracted period.  This case must be remanded for a reevaluation of the medical evidence and, if deemed advisable by the Commissioner, receipt of additional medical evidence.

   **3.   Whether the ALJ Improperly Evaluated Plaintiff's Credibility Regarding the Intensity of his Pain?**

The ALJ acknowledged that Plaintiff had a severe physical impairment, degenerative disc disease of the lumbar spine.  (R.14). The ALJ also found that Plaintiff's degenerative disc disease could reasonably be expected to cause the lower back and radiating pain

30

of which Plaintiff complains and to which his treating physician has testified.  (R.16).   Nevertheless, the ALJ concluded that Plaintiff's complaints regarding the limiting effects of his pain are not entirely credible because of supposed inconsistencies such as Dr. Morganstein's findings that Plaintiff continued to have 5 over 5 strength in his lower extremities, displayed no lower limb atrophy, and was fully oriented on multiple occasions when he examined Plaintiff.  (R.16-17).   While these indicia may, or may not, be categorically inconsistent with Plaintiff's complaints of severe unrelenting pain, the Court cannot regard them as "substantial evidence" absent commentary from a medical expert to that effect.   The ALJ's medically unsupported conclusions to the contrary constitutes impermissible speculation from a poorly developed record.   Biller v. Acting Commissioner, 962 F. Supp. 2d. 761, 778-79 (W.D. Pa 2013)   The record simply contains no such evidence and is inadequately developed for this Court to sanction the ALJ's conclusion.   This matter must also be remanded for a better detailed and medically documented discussion of the extent to which pain limits Plaintiff's functional capacity.

> **4.**      **Whether the ALJ Erred in Finding that Plaintiff Engaged in Substantial Gainful Activity During the Third Quarter of 2013?**

Plaintiff correctly asserts that the SSA's 2013 criteria for determining whether an individual performed substantial gainful

31

activity is $1,040.00 per month.  In other words, a person who made less than $1,040.00 per month in 2013 would not be deemed to have performed substantial gainful activity in that period.  The ALJ's finding that Plaintiff engaged in substantial gainful activity in the third quarter (July, August and September) of 2013 is simply belied by the record.  Plaintiff Morder's entire earnings in the third quarter of 2013 amounted to $1008.00 (R.259), a sum insufficient to be characterized as even one month of substantial gainful activity.  This is simply an arithmetic error by the Agency and the ALJ's conclusion that Plaintiff is disqualified from receipt of DIB for financial reasons in the third quarter of 2013 *is reversed.*

**IX.   Conclusion.**

The Court finds it troubling that the Commissioner would deny benefits for a time frame in which the Plaintiff had some medical documentation of disability and the Agency had no relevant medical evidence to the contrary.  At the very least this indicates a failure on the Agency's part to develop the record adequately. Rutherford v. Barnhart, 399 F.3d 546, 557 (3d. Cir. 2005); See also Boone v. Barnhart, 353 F.3d 203, 208 n.11 (3d. Cir. 2004).  Thus, *the Court will direct a remand of this matter for reconsideration* of all points identified in the foregoing Memorandum.

*BY THE COURT*

S/Richard P. Conaboy
*Honorable Richard P. Conaboy*
*United States District Court*

*Dated: October 24, 2016*